UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

William F. Healy, an Illinois resident,
and Red Carpet Travel, Inc.,
an Illinois corporation,

Plaintiffs,

v.

Carlson Travel Network Associates, Inc.,
a Minnesota corporation,

Defendant.

**MEMORANDUM OPINION AND ORDER**
Civil No. 01-1103 ADM/SRN

---

Jeffery S. Haaf, Esq., Dady & Garner, P.A., Minneapolis, Minnesota, appeared for and on behalf of the Plaintiffs.

Kirk W. Reilly, Esq., Gray, Plant, Mooty, Mooty & Bennett, P.A., Minneapolis, Minnesota, appeared for and on behalf of the Defendant.

---

## I. INTRODUCTION

On September 4, 2002, Defendant Carlson Travel Network Associates, Inc. ("Carlson") argued its Motion for Summary Judgment [Doc. No. 13], and Plaintiffs William F. Healy ("Healy") and Red Carpet Travel, Inc. ("Red Carpet") argued their Cross Motion for Partial Summary Judgment [Doc. No. 17] before the undersigned United States District Judge. Carlson sought judgment on all Plaintiffs' claims, while Plaintiffs requested declaratory judgments (1) that the Minnesota Franchise Act, Minn. Stat. § 80C, ("MFA") applies to this action, (2) prohibiting Defendant Carlson from using boilerplate language to disaffirm fraud, (3) that Carlson may not seek lost future profits from Healy, and (4) that Carlson may not collect

FILED
RICHARD D SLETTEN, CLERK
JUDGMENT ENTD
DEPUTY CLERK

attorneys' fees from Healy. For the reasons set forth below, Defendant's Motion is granted in part and denied in part, and Plaintiffs' Cross Motion is granted in part and denied in part.

## II. BACKGROUND

This controversy arises out of a failed franchise relationship between Healy and Carlson. Shortly after ceasing business as a travel agency and Carlson franchisee, Healy filed suit claiming breach of contract, breach of the covenant of good faith and fair dealing, de facto termination, violation of the MFA and the Illinois Franchise Disclosure Act, 815 Ill. Comp. Stat. § 705/41 ("IFDA"), and fraud. Am. Compl. ¶¶ 1, 10 [Doc. No. 9]. Healy asserts that Carlson induced him into purchasing a franchise and then failed to provide the promised services and support, thereby causing him to incur monetary damages. Pls.' Mem. at 1.

Plaintiff Healy is a retired Chicago police officer who became interested in owning a franchise travel business. Before acquiring a Carlson franchise, Healy had no experience in the travel industry, but was previously self-employed as a business person, successfully running his own Cottman Transmission franchise for five years, beginning in the late 1970s. Defendant Carlson is a Minnesota corporation and the owner of a national travel agency network called "Carlson Wagonlit Travel," which sells licenses to franchisees for the use of the Carlson Wagonlit brand. Healy's corporation, Plaintiff Red Carpet Travel, became a Carlson franchise located in Westchester, Illinois.

In January 1999, in response to an advertisement in the Chicago Tribune, Healy called a Carlson office in St. Petersburg, Florida, to inquire about franchise opportunities. Carlson sales representative John Crider telephoned Healy a few days later and they agreed to meet in Chicago in February. On February 5, 1999, Healy and Crider met at a Chicago hotel, where Crider

provided Healy a copy of the Uniform Franchise Offering Circular ("UFOC").[1] Healy Dep. at 80. Healy took the UFOC to his son-in-law, an attorney, to review and give Healy his opinion on the content. Id. at 83. Healy acknowledges that he read and understood the UFOC and that he also had his long-time accountant review the document. Id. at 127. During this time, Healy and Crider spoke by telephone on several occasions. On March 26, 1999, Crider provided Healy with a new copy of the UFOC showing the changes that would go into effect on April 1, 1999.

On March 29, 1999, at a meeting with Crider in Chicago, Healy signed the License Agreement (the "Agreement") to become a Carlson franchisee. Healy alleges that Crider pressured him at this meeting to sign the contract by informing him that the franchise fees would increase as of April 1, 1999, and that "he had better not delay in signing the franchise agreement." Am. Compl. ¶ 9. Healy admits he read the Agreement before signing it. Healy Dep. at 123.

As part of the closing process, Healy was also given a Franchise Closing Checklist ("FCC"), a one-page list of statements for the franchisee to initial, certifying that he fully understands certain key points of the franchise relationship. Above the bullet-pointed phrases, the FCC states in bold capital letters, "DO NOT INITIAL ANY OF THE FOLLOWING STATEMENTS IF IT IS NOT TRUE!" FCC at 1 (Tecson Aff. Ex. F). Of particular relevance to this litigation are the following statements:

I have had adequate time to review the UFOC with my own attorney or accountant.

Any questions that I have had about the Carlson Wagonlit Travel franchise have been

[1] The UFOC is a document required by law to be distributed to potential franchisees, containing detailed information about the particular franchise and the prospective franchise relationship.

> answered to my satisfaction.
>
> I have not relied solely upon what "Carlson Wagonlit Travel" and its Sales Representative told me about the Carlson Wagonlit Travel franchises but have conducted my own investigation of the franchise.
>
> I understand that this franchise, like any franchise or other business investment, offers and opportunity but also entails risk and that there is no assurance that my franchise will be successful.
>
> I have not been given by "Carlson Wagonlit Travel" or by its Sales Representative, and I have not relied upon, any oral or written promises, representations, or assurances of any specific actual, projected or pro forma sales, profits, earnings or break even point for my franchise or any other "Carlson Wagonlit Travel" franchise(s) or outlet(s).

Id. (emphasis in original).

Healy claims that though some of these statements were not true, Crider urged him to initial all of them to complete the signing process. Specifically, Healy asserts that, with respect to the statement "I have not relied solely on what Carlson Wagonlit Travel and its Sales Representative have told me about the Carlson Wagonlit Travel franchise . . . ," he informed Crider that he would prefer not to initial this statement because he was relying on everything Crider had told him, and that Crider then explained that the phrase meant Healy was not "solely" relying, such that he was not relying on everything "word for word." Healy Dep. at 128. Healy claims that Crider then said the list had to be completed to go forward with the closing, that Healy told Crider he believed what Crider had told him and proceeded to initial the statement. Id. Healy inserted a handwritten comment that he had not paid a deposit, in response to a statement asking him to initial that he had "not paid any money other than the deposit fee or other consideration, relating to this franchise." FCC at 1. He initialed the remainder of the checklist without written comment, representing that each statement was true.

In the winter of 1999, preparing to open his franchise, Healy worked with Carlson Start-Up Specialist Nati Mavridis ("Mavridis") to select a manager for his travel agency. Healy forwarded resumes he received to Mavridis, who interviewed various candidates by phone and then instructed Healy to personally interview certain applicants Mavridis believed to be qualified. Healy Dep. at 114. Healy conducted interviews of several individuals and eventually hired Cathy Gurin ("Gurin") to act as manager and Airline Reporting Corporation ("ARC") qualifier.[2] Id. at 116, 149. Healy alleges he chose Gurin based on the recommendation of Mavridis and that he was "completely dependent on Mavridis' decision." Pls.' Mem. at 6.

Healy opened Red Carpet on February 28, 2000. By the terms of the Agreement, Carlson was to provide a representative at the opening. Agreement art. 3(j) (Tecson Aff. Ex. J). The parties agree that no Carlson representative was present on opening day and that an official "Opening Visit," during which a start-up specialist visits the franchisee's agency to oversee operations, did not occur until April 26, 2000. However, a Carlson agent was present at Red Carpet on March 23, 2000, but since Mavridis was ill the opening visit was postponed. Blattner Dep. at 26-29; Healy Dep. at 164-66.

From the outset, Healy experienced various disappointments and problems with his business. At the time of the opening, Healy's manager had not yet received ARC approval, which required Red Carpet to pay another agency forty percent of its commissions for the writing of its tickets. Healy Aff. ¶ 22. Due to a problem with Carlson's 800-number directory, from March to May, 2000, Healy's agency was not included in the phone system as a Carlson

---

[2] To write its own tickets, a travel agency must have ARC approval, which requires a qualified agency employee to submit an ARC application and take the ARC examination.

franchise, causing Red Carpet to miss out on referrals it should have received. Id. ¶ 23; Def.'s Mem. at 16. Additionally, Carlson initially failed to inform certain preferred vendors of Red Carpet's status as an operational franchise. Healy Aff. ¶ 24; Def.'s Mem. at 16. Carlson issued Healy monetary credits to make up for these omissions. Healy Aff. ¶ 23; Def.'s Mem. at 16.

Healy's experience with his manager, Gurin, was less than satisfactory. According to Healy, Gurin made serious errors in the performance of her duties, and stole money from the agency before quitting unexpectedly May 17, 2000. Am. Compl. ¶ 11(g); Healy Dep. at 175-80. Because Healy did not know how to operate the computer system, he was unable to do business until the first week of June, 2000, when Mavridis came to act as a temporary manager for Red Carpet Travel. Reva Herrick was subsequently hired to replace Gurin, but according to Healy she also made "costly mistakes" and left the agency in August, 2000. Pls.' Mem. at 8-9. Healy then employed a third manager, Barbara Nowiki, who stayed at Red Carpet until it ceased doing business March 30, 2001. Neither Healy nor any of his managers ever became ARC qualified. Healy claims he suffered a loss of $144,151.00 in the failure of Red Carpet. Healy Aff. ¶ 31; 2001 Income Tax Return at 4 (Tecson Aff. Ex. I).

Although Healy does not assert a claim of duress or coercion, he alleges that Carlson knew he had no experience in the travel industry and that he was completely dependent upon its staff to assist him in establishing the business. Healy argues that Carlson is responsible for his business failure because its representative, Crider, induced Healy into entering the franchise agreement by making fraudulent statements and projections about the average profitability of Carlson franchises, and about the services and support Carlson would provide to Healy as a franchisee.

In particular, Healy claims the following promises were made and unfulfilled by Carlson: (1) that Carlson would have a representative present at Healy's opening; (2) that a "start-up specialist" would be on-site for Healy's first week of business to assist him in setting up; (3) that, as a franchisee, Healy would benefit from Carlson services and use of the Carlson Wagonlit Travel brand; (4) that an 800-number would direct local callers to Red Carpet Travel; (5) that Carlson would provide "significant and meaningful assistance on a regular and ongoing basis;" (6) that Healy's agency would be ARC approved within 90 days of opening; (7) and that if Healy were left without a manager for a period of time, Carlson would do his bookings for a small fee until he found a replacement. Am. Compl. ¶ 7; Healy Aff. ¶ 11. Healy further asserts that Carlson, through Crider, materially misrepresented the prospective arrangement by stating that no experience was necessary to be a Carlson franchisee and by failing to inform Healy that, until he had ARC approval, he would have to pay another agency approximately fifty percent[3] of his commissions to write tickets for him. Am. Compl. ¶¶ 7(a), 11(f).

With respect to assertions of potential earnings, Healy alleges that Crider told him "that the average start-up makes '$1.2 million a year, and that you can add a million for each year for the next three years,'" and that the average Carlson franchise does $3.8 million per year in sales. Am. Compl. ¶ 35.

Carlson responds that it satisfied its contractual obligations to Healy, made no misrepresentations regarding the franchise agreement, and that the failure of Healy's agency was due to poor management and business decisions and the costly errors Healy admits his first two

---

[3] Though the usual fee for ticketing through another agency is fifty percent of the sale commission, Healy negotiated an arrangement with a neighboring agency, whereby Red Carpet would pay the agency forty percent of its commissions. Healy Aff. ¶ 22.

managers committed. Healy Dep. at 178-79, 187-88.

Based on Healy's closure of Red Carpet, Carlson terminated the Agreement on April 26, 2001. Carlson alleges that Healy continues to owe it money for license and marketing fees and has asserted a counterclaim for breach of contract and attorneys' fees. Def.'s Answer and Countercl. ¶¶ 13, 18.

## III. DISCUSSION

### A. STANDARD FOR SUMMARY JUDGMENT

Rule 56(c) of the Federal Rules of Civil Procedure provides that the court shall render summary judgment if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); see Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

On a motion for summary judgment, the court views the evidence in the light most favorable to the nonmoving party. Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995). However, the nonmoving party may not "rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial." Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

### B. CARLSON'S MOTION FOR SUMMARY JUDGMENT

Carlson seeks summary judgment on all of Healy's claims, arguing that, even when construed in favor of Healy, the facts do not establish prima facie causes of action. Carlson argues the various documents Healy admits he read and understood plainly spell out the terms of the agreement and specifically disclaim statements Healy asserts reliance upon.

**1. Choice of Law**

As an initial matter, the Court must determine which law will govern this case. Much of the parties' dispute centers on whether the Minnesota Franchise Act ("MFA") applies to this action. Healy argues that the MFA governs this suit, based on the choice of law provision in the Agreement, which reads, "[t]his Agreement is accepted in and shall be construed in accordance with the laws of the State of Minnesota." Agreement art. 22. Carlson contends that the non-waiver provision of the Illinois Franchise Disclosure Act ("IFDA") trumps the choice of law clause, and therefore that Illinois law controls. The interaction of state franchise laws with contractual choice of law clauses has been a point of debate in both Minnesota and Illinois courts.

In Modern Computer Sys. v. Modern Banking, 871 F.2d 734, 738 (8th Cir 1989), the Eighth Circuit held that a choice of law clause selecting Nebraska law to govern the contract precluded application of the MFA, despite the policy and non-waiver provision of the statute. The Minnesota legislature quickly responded by amending MFA section 80C.21 to explicitly prevent circumventing the MFA through choice of law provisions.[4] Minn. Stat. § 80C.21 (as amended by 1989 Minn. Laws 1989 ch. 198, sec. 2); DeLaria v. KFC Corp., Civ. No. 4-94-116, 1995 U.S. Dist. LEXIS 21516, at *17 (D. Minn. Jan. 13, 1995) (noting that amendment was in response to the Modern Computer decision). Since the 1989 amendment, Section 80C.21, the MFA non-waiver provision, has been held to override contractual choice of law. DeLaria, 1995

[4] The statute now states that "[a]ny condition, stipulation, or provision, including any choice of law provision purporting to bind . . . a person acquiring any franchise to be operated in this state to waive compliance or which has the effect of waiving compliance with any provision of sections 80C.01 to 80C.22 or any rule or order thereunder is void." Minn. Stat. § 80C.21 (2001) (emphasis added).

U.S. Dist. LEXIS 21516, at *17. Reviewing the Modern Computer case and the corresponding corrective action by the state legislature, Judge Doty invalidated the parties' Kentucky choice of law clause, stating that "although the agreements provide that Kentucky law applies, the court holds that the Minnesota Franchise Act is applicable." Id.

Illinois courts have similarly held that the IFDA's non-waiver provision voids choice of law clauses in franchise agreements. Bixby's Food Sys., Inc. v. McKay, 193 F. Supp. 2d 1053, 1060 (N.D. Ill. 2002); To-Am Equip. Co. v. Mitsubishi Caterpillar Forklift Am., 913 F. Supp. 1148, 1150 (N.D. Ill. 1995), *aff'd*, 152 F.3d 658 (7th Cir. 1998); Hengel, Inc. v. Hot'N'Now, Inc., 825 F. Supp. 1311, 1316-17 (N.D. Ill. 1993). The IFDA non-waiver section states that "any condition, stipulation, or provision purporting to bind any person acquiring a franchise to waive compliance with any provision of this Act is void." 815 Ill. Comp. Stat. § 705/41 (West 2002). Though this language, unlike that of the MFA, does not specifically identify choice of law provisions, the Illinois courts interpreted IFDA section 705/41 as nullifying choice of law clauses in franchise agreements that would otherwise be covered by the IFDA. Hengel, 825 F. Supp. at 1316-17. After a lengthy analysis of the competing concerns and prior case law, the court determined that "the specific 'anti-waiver' provision under the Illinois franchise statute represents a fundamental policy which invalidates contractual choice of law in the franchise context." Id.

Notably, the court so held even though the defendant franchisor was the party arguing for invalidation of its own choice of law clause, and even though Michigan law, the law called for in the agreement, also contained protections for franchisees. Id. at 1316, 1323. Nevertheless, the court focused on the public policy to be furthered by the IFDA and found "that the Illinois

General Assembly intended to benefit Illinois residents and franchisees." Id. at 1316 (citations omitted).

Recently, in Bixby's Food Sys., Inc. v. McKay, the IFDA non-waiver provision was again found to have trumped the choice of law clause in the franchise agreement at issue. 193 F. Supp. 2d at 1060. In Bixby's, the Plaintiff franchisees asserted claims under both the MFA and the IFDA. Id. at 1057. Though the contract provided that Minnesota law was to apply, the court held that the IFDA governed the dispute, as the parties' choice of Minnesota law was void under the IFDA non-waiver provision. Id. at 1060. Since the Plaintiffs, Illinois residents who opened an Illinois franchise, did not demonstrate "any reason [why] the Minnesota Franchise Act applie[d]" to their case, they were precluded from claiming the defendant violated the MFA. Id. at 1063.

The instant case, like Hengel and Bixby's, presents the curious and potentially inequitable position of the Defendant franchisor seeking to void its own governing law provision by way of an anti-waiver clause of another state's statute. This produces the result that the IFDA, enacted to protect franchisees, avoids application of the analogous MFA, which would provide the Plaintiff with additional remedies. This, however, is the current state of the case law, and upon further analysis, makes sense in the present case in light of the relationship between the parties and the states involved.

In DeLaria, the Minnesota case, and in the Illinois cases cited above, the law the courts chose to apply to the disputes was, in each instance, the law of the state in which the franchise was located. Bixby's, 193 F. Supp. 2d at 1058, 1063; To-Am, 913 F. Supp. at 1150; Hengel, 825 F. Supp. at 1317; DeLaria, 1995 U.S. Dist. LEXIS 21516, at *2. This is in accordance with the

policy of the IFDA to offer protections for franchisees in Illinois, Hengel, 825 F. Supp. at 1316, and the policy of the MFA to guard against abuses of franchisees in Minnesota. Pacific Equip. & Irrigation v. Toro Co., 519 N.W.2d 911, 916 (Minn. Ct. App. 1994). The conflict is not whether Healy is protected by a state franchise statute, but rather under which state's law he may seek recourse.

In this case, the circumstances giving rise to this litigation reveal substantial contacts with Illinois. Healy is an Illinois resident and his franchise, Red Carpet, was located in Illinois. The solicitation and closing of the sale, along with the various meetings between Healy and Crider, Carlson's representative, all took place in Illinois. Though Carlson is a Minnesota corporation, Crider, the agent who initially contacted Healy and with whom Healy discussed and signed the Agreement, was based out of St. Petersburg, Florida, and traveled to Chicago to meet with Healy. Furthermore, the Agreement contained a mandated "Illinois Addendum," signed by both parties, that indicates that Illinois statutory law supercedes parts of the contract:

> Except as set forth below, the foregoing "Carlson Wagonlit Travel" License Agreement shall remain in full force and effect in accordance with its terms. . . .
>
> Illinois law in effect as of the date of execution of the License Agreement provides, in part, as follows:
>
>> Section 41 of the Illinois Franchise Disclosure Act states that "any condition, stipulation, or provision purporting to bind any person acquiring any franchise to waive compliance with any provision of the Act is void. ["] . . .
>
> The foregoing statutory provisions supersedes [sic] any inconsistent provision of the "Carlson Wagonlit Travel" License Agreement.

Agreement, Ill. Addendum (Reilly Aff. Ex. H). At a minimum, this signed Addendum provided notice that Illinois law may play a role in any potential disputes.

Consistent with the Minnesota and Illinois case law regarding franchise statutes and

governing law clauses, the anti-waiver provision of the IFDA voids the choice of law clause in this case, Article 22 of the Agreement. Illinois law governs the parties' contract, based on the relationship of this action to Illinois. An argument remains that Healy may be entitled to the rights and remedies established in the MFA if he can show that he is otherwise covered by the statute. See Bixby's, 193 F. Supp. 2d at 1063-64.

### 2. Minnesota Franchise Act

The MFA applies to a franchise relationship "when a sale or offer to sell is made in this state; when an offer to purchase is made and accepted in this state; or when the franchise is to be located in this state." Minn. Stat. § 80C.19 Subd. 1 (2001). Healy makes two claims under the MFA and the regulations promulgated thereunder.

Healy urges that the statute applies because the offer to sell the franchise came from an agent of Carlson, a Minnesota corporation. No authority is cited for the proposition that the MFA applies merely because the franchisor is a Minnesota corporation. Healy concedes that Crider, the Carlson agent he contacted for information and with whom he negotiated the sale, was based in Florida. The newspaper advertisement for Carlson franchise opportunities that Healy responded to, was placed in the Chicago Tribune by Crider's office in St. Petersburg, Florida. The Agreement was presented to and signed by Healy in Illinois. Healy has not demonstrated that the MFA applies to his case.

Based on MFA section 80C.19 and Minnesota and Illinois case law, as well as an analysis of the various contacts involved in Healy's claims, the Court concludes that the Illinois Franchise Disclosure Act controls and the Minnesota Franchise Act is inapplicable to this case.

### 3. Breach of Contract and Covenant of Good Faith and Fair Dealing

Count II of the Amended Complaint alleges breach of contract and of the covenant of good faith and fair dealing by Carlson. Both parties' memoranda address these issues exclusively under Minnesota law, which this Court has now concluded does not apply in the instant case. Despite Carlson's argument that the IFDA nullifies the Agreement's choice of law provision, both parties seem to assume that Minnesota common law governs the remainder of the dispute. However, because the controlling legal principles are nearly identical in Illinois and Minnesota, and because the result is the same under either analysis, the Court will address the arguments of the parties, based on Minnesota law, but will also reference the law of Illinois.

#### a. Breach of Contract

To establish a breach of contract, a plaintiff must establish "the defendant's breach of the terms of the contract, and damages resulting from the breach." Mannion v. Stallings & Co., 561 N.E.2d 1134, 1138 (Ill. App. Ct. 1990); accord D.H. Blattner & Sons, Inc. v. Fireman's Ins. Co. of Newark, New Jersey, 535 N.W.2d 671, 675 (Minn. Ct. App. 1995). The defendant's breach must be the proximate cause of the damages. Blattner, 535 N.W.2d at 675. A plaintiff claiming lost profits must prove such damages with reasonable certainty. Polaris Indus. v. Plastics, Inc., 299 N.W.2d 414, 419 (Minn. 1980); SK Handtool Corp. v. Dresser Indus., Inc., 672 N.E.2d 341, 348 (Ill. App. Ct. 1996). Ordinarily, "proof of lost profits in a new business is too speculative to be the basis for recovery." Leoni v. Bemis Co., 255 N.W.2d 824, 826 (Minn. 1977) (citation omitted); accord Dresser, 672 N.E.2d at 348.

Healy's Amended Complaint does not specify which contract provisions he claims Carlson breached, but avers that "[b]y its conduct, as set forth above, Defendant has breached its

contractual duties to Plaintiffs by violating Plaintiffs' reasonable expectations under the franchise agreement and by essentially terminating Plaintiffs' franchise without cause." Am. Compl. ¶ 22.

Article 3 of the Agreement, entitled "Carlson Services," sets forth Carlson's obligations to its franchisees (termed "Associates"), which appear to be relevant to the breach claim. This section states that "Carlson will advise in the hiring of an initial ARC qualifier as a member of Associate's opening staff," and "will provide a representative at Associate's agency opening and shall provide field visits to Associate's travel agency throughout the term of the License Agreement." Agreement arts. 3(i), 3(j). Based on the allegations in Healy's pleadings, these appear to be the only contract provisions relevant to his claims.

Though dissatisfied with the results of the manager selection process, Healy concedes that Carlson did participate and advise him in the initial hiring of an ARC qualifier, by reviewing resumes, conducting phone interviews, and forwarding qualified candidates' names to Healy. Healy Dep. at 108-116. As such, there can be no literal breach of Article 3(i). In contrast, Carlson admits not providing a representative at Healy's opening, as required by Article 3(j). Although this constitutes a breach of the Agreement, there are no damages identified as having been caused by the failure to have a representative present on opening day.

As noted above, any claim by a new business for lost profits will be very difficult to establish because of the uncertainty inherent in such a calculation. Leoni, 255 N.W.2d at 826; Dresser, 672 N.E.2d at 348. While there are exceptions to this general principle, Healy's failure to plead any damages specifically traceable to Carlson's breach defeats his claim for breach of contract. See Blattner, 535 N.W.2d at 675; Mannion, 561 N.E.2d at 1138.

**b. The Covenant of Good Faith and Fair Dealing**

Minnesota recognizes the covenant of good faith and fair dealing as implicit in every contract, such that "one party may not make it impossible for the other party to perform the contract." American Warehousing & Distrib., Inc. v. Michael Ede Mgmt., Inc., 414 N.W.2d 554, 557-58 (Minn. Ct. App. 1987) (citation omitted). Illinois courts similarly hold that "[e]very contract contains an implied covenant of good faith and fair dealing," that prohibits one party from doing "anything that will destroy the other party's right to receive the benefit of the contract." Northern Trust Co. v. VIII S. Mich. Associates, 657 N.E.2d 1095, 1104 (Ill. App. Ct. 1995); Voyles v. Sandia Mort. Corp., 751 N.E.2d 1126, 1131 (Ill. 2001). This implied covenant, however, may not be used to defeat express contract terms, but is instead a gap-filler that only becomes operative when the agreement does not cover the parties' obligations at issue. Taylor Equip., Inc. v. John Deere Co., 98 F.3d 1028, 1032 (8th Cir. 1996); Northern Trust, 657 N.E.2d at 1104 (expressing that "an implied covenant of good faith cannot overrule or modify the express terms of a contract").

Here, the License Agreement between Healy and Carlson spells out the relative rights and duties of the parties. As stated above, other than the absence of a representative on Red Carpet's opening day, Healy has not shown that Carlson failed to fulfill the obligations prescribed to it in the Agreement. Healy's contentions regarding Carlson's failed business routing services and poor recommendation of ARC qualifiers,[5] cannot modify the plain terms of the written

---

[5] Much of Healy's discontent appears to stem from his frustration with the substandard performance of his first manager, Gurin, and, to a lesser extent, his second manager, Reva Herrick. Healy asserts that both these managers/ARC qualifiers "made costly mistakes" and concedes that at least part of his agency's failure was due to the adverse impact caused by these managers. Healy Dep. at 179, 191, 201. Healy claims "Carlson did a horrible job of assisting

agreement. See Taylor Equip., 98 F.3d at 1032; Northern Trust, 657 N.E.2d at 1104. Healy asserts no facts that establish that Carlson made it impossible for Healy to perform under the contract or that, in its performance of its contractual obligations, Carlson acted so unreasonably as to defeat Healy's right to the benefits of the bargain. Healy's deposition testimony reveals that instead of "essentially making it impossible for the Plaintiff to operate a successful franchise," Carlson helped Healy hire a manager, provided a start-up specialist at his agency, albeit belatedly, sent Mavridis to work as a temporary manager for Healy after Gurin quit unexpectedly, and communicated with him about various marketing seminars and suggestions. Pls.' Mem. at 13; Healy Dep. at 108, 111-16, 147-50, 163-66, 186, 156, 192-93. There is no evidence to substantiate Healy's charge that Carlson acted to frustrate Healy's rights under the contract. Without impermissibly adding terms to the Agreement, Healy cannot show Carlson breached its contractual obligations to him or the covenant of good faith and fair dealing. Accordingly,

---

[him] in gaining ARC approval." Am. Compl. ¶ 11(g).

Healy's contention that Carlson was responsible for the poor performance of his managers is not supported by the record. Healy's deposition testimony is that Mavridis recommended more than one candidate for the job and told Healy that it was ultimately his decision who to hire as manager. Healy Dep. 114, 149-50. Though contradicted in his affidavit in opposition to summary judgment, by saying that Mavridis never informed him that the final hiring choice was Healy's decision, such an attempt to impeach his own prior statement will not create a fact issue. See, e.g., American Airlines v. KLM Royal Dutch Airlines, 114 F.3d 108, 111 (8th Cir. 1997) (stating that directly contradicting previous sworn testimony, without explanation, does not raise a genuine issue of fact). Furthermore, both the Agreement and the Getting Started Manual make clear that the franchisee is an independent contractor who makes the final decision on who to hire as a manager. Agreement art. 21; Manual Sec. 400 (Tecson Aff. Ex. J; Second Reilly Aff. Ex. F).

Regarding ARC approval, Healy conceded in deposition that his failure to get an ARC-qualified agent was not attributable to Carlson. Healy Dep. at 225. Further, the Agreement, which Healy admits he read, understood and had his attorney son-in-law review, plainly states in Article 8 that it is the franchisee's duty to apply for and receive ARC approval within 90 days of the agency opening. Agreement art. 8(s).

Carlson's Motion for Summary Judgment on this count is granted.

### 4. De Facto Termination

Not only does neither Minnesota nor Illinois recognize de facto termination as a cause of action, but, the doctrine applies only where the franchisor, though not officially terminating the franchise, makes it effectively impossible for the franchisee to do business. Pls.' Mem. at 14 [Doc. No. 18]. Firstly, Carlson did *officially* terminate Healy's franchise, pursuant to the Agreement, when Healy closed his business. Secondly, the above disposition of Healy's covenant of good faith and fair dealing claim establishes that Carlson did not render it impossible for Healy to operate his franchise. See supra, part III(B)(3)(b). Thus, summary judgment for Carlson on this claim is granted.

### 5. Illinois Franchise Disclosure Act

Healy alleges that Carlson violated Section 705/6 of the IFDA, which prohibits "(a) employ[ing] any device, scheme or artifice to defraud; (b) mak[ing] any untrue statement of a material fact or omit[ting] to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading; or (c) engag[ing] in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person" in connection with franchise offers or sales. 815 Ill. Comp. Stat. § 705/6 (West 2002).

Under the IFDA, statements regarding future events, rather than present facts, are generally not actionable. See Bixby's, 193 F. Supp. 2d at 1062. "[P]redictions of future sales or profitability are not considered representations of preexisting material facts." Id. "Common law fraud principles are applicable to claims brought pursuant to Section 705/6 of the" IFDA. Shell Oil Co. v. Amar Corp., No. 97 C 4479, 1998 U.S. Dist. LEXIS 8657, at *33 (N.D. Ill. Jun 05,

1998); see also Bixby's, 193 F. Supp. 2d at 1062.

Carlson argues that Healy's claim here must fail because he has not alleged any false statements of material present fact. Healy counters that the averments in the complaint "provide a sufficient factual basis for a fraud claim . . . against Carlson." Pls.' Mem. at 20. However, in the Amended Complaint, Count IV, alleging a violation of the IFDA, fails to specify which representations were untrue statements. Further, this count of the complaint does not reference any particular statements by Carlson, making it difficult to determine which representations were fraudulent. Am. Compl. ¶ 38.

Healy's memorandum in this motion cites the following series of alleged representations by Carlson:

(1) No experience was necessary to become a successful Carlson franchise;
(2) Carlson would provide a representative at the opening of Plaintiff's franchise;
(3) Plaintiff would have access to all the benefits of operating under the Carlson "global brand;"
(4) An "800" number would route business to his location;
(5) The Plaintiff could expect to do $1.2 Million in business his first year, $2 million his second year, and $3 million his third year . . .
(6) Carlson failed to tell the Plaintiff that he would have to pay up to 50 percent of his commission to another agency until the Plaintiff's agency obtained ARC approval.

Pls.' Mem. at 20-21 (footnote citations omitted). Additionally, in a later section of his memorandum, Healy claims Crider told him Carlson would do his ticketing for a small fee if he were left without a manager and that he would be given adequate training. Id. at 24. These alleged untrue statements fall into three general categories: future earning expectations, services and benefits to be provided by Carlson, and a material omission concerning commission splits.

**a. Future Earning Expectations**

There are several deficiencies in Healy's claim of fraud based on Crider's alleged

statements regarding the average profitability of Carlson franchises.[6] Primarily, Healy does not allege in his Complaint that these figures are false, and in fact admits in his deposition that he does not know whether they are true. Healy Dep. at 232. Second, such representations of expected earnings are not actionable under IFDA Section 705/6 because they are not representations of present material fact. Bixby's, 193 F. Supp. at 1065; Hengel, 825 F. Supp. at 1321-22. Furthermore, in the FCC, Healy specifically disclaimed that he had been given or relied on "any oral or written promises, representations or assurances of any specific actual, projected or pro forma sales, profits, earnings or break even point" for his or any Carlson franchise. FCC at 1. Accordingly, these allegations are insufficient as a matter of law to state a claim for misrepresentation under the IFDA.

**b. Services and Benefits to be Provided by Carlson**

Notwithstanding the above rule that representations of future events cannot be fraud, Illinois courts have created an exception for promises of future conduct where the promises are made in bad faith with the intent to deceive. See Bixby's, 193 F. Supp. 2d at 1065; Junikki Imports, Inc. v. Toyota Motor Co., 335 F. Supp. 593 (N.D. Ill. 1971) (citation omitted). Healy argues "Crider misrepresented the extent of support that Carlson would be able to provide" by promising future services Healy did not receive. Pls.' Mem. at 24.

Though there were intermittent problems with some of the promised Carlson services, namely the opening day representative, the 800-number, and the vendor notification, Healy does

---

[6] Healy's pleadings also make reference to an alleged misrepresentation by Crider that "Carlson franchisees do average sales of $3.8 million a year." Am. Compl. ¶ 8. Although this is an articulation of present fact, as with the earnings expectancy statements, Healy fails to assert that this figure is false and admits that he does not know if it is accurate. Healy Dep. at 232. It cannot, therefore, provide a basis for fraud.

not claim that Carlson intentionally caused these failures nor does he offer any evidence that Crider knew or could have foreseen that his representations about these benefits would prove to be inaccurate. Without any proof of a scheme to defraud, statements assuring the occurrence of future events do not constitute fraud under Illinois law. Bixby's, 193 F. Supp. 2d at 1065; Hengel, 825 F. Supp. at 1321; Junikki, 335 F. Supp. at 596.

Healy relies on an Illinois case in which the court affirmed that misrepresentations by the franchisor concerning the amount and quality of the franchisor's aid to the franchisee were sufficient to state a prima facie case of fraud. Salkeld v. V.R. Bus. Brokers, 548 N.W.2d 1151, 1158 (Ill. App. Ct. 1989). Unlike the present case, the franchisee's claims in Salkeld included specific statements by the franchisor of *past and present* facts about the financial stability of and degree of competition with the company. Id. at 1153-54. Moreover, the plaintiff in Salkeld made multiple complaints to the defendant regarding the lack of support provided and never received any of the promised services, such as advertising and trained staff. Id.

Here, the undisputed evidence refutes the contention of falsity with respect to many of Healy's complaints. Several Carlson representations did not prove to be false. Carlson did belatedly provide the promised opening visit, call routing, and vendor notification. During the franchise association, Carlson representatives contacted Healy about relevant seminars in his area, suggested marketing strategy, visited his agency, and sent Mavridis to work as a temporary manager when Gurin quit without notice and Healy was left with no one to operate his reservation system. Healy Dep. at 156, 192-93, 163-66, 186. Though Healy may have found such actions insubstantial and insufficient, without offering evidence that Crider or Carlson promised him a degree or quality of support he did not receive with the intent to defraud Healy

into entering a franchise agreement, allegations of promised future conduct are not an adequate basis for fraud under the IFDA. See Bixby's, 193 F. Supp. 2d at 1062; Servpro Indust., Inc. v. Schmidt, No. 94 C 5866, 1996 U.S. Dist. LEXIS 9857, at *17 (N.D. Ill. July 15, 1996); Hengel, 825 F. Supp. at 1321; Junikki, 335 F. Supp. at 596.

Healy's conclusory assertions that Carlson knew its representations were false or acted with disregard for their truth or falsity, will not suffice to defeat the general rule that statements ensuring the occurrence of future events are not actionable. See Servpro, 1996 U.S. Dist. LEXIS 9857, at *17.

**c. Material Omission**

The third type of alleged misrepresentation that emerges from Healy's pleadings is the claimed omission by Carlson regarding commission splits between agencies. Healy asserts he asked Crider who would write his tickets pending his ARC approval, and Crider responded that another agency would do so, without informing Healy that Healy would have to split his commission with the other agency for this service.

It is a violation of the IFDA to "omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading." 815 Ill. Comp. Stat. § 705/6 (West 2002).

Assuming arguendo, that this was an omission of material fact,[7] problems remain with this claim. First, it is not clear that, without more, Crider's answer to Healy's question about ticketing was misleading. Healy admits that he did not ask whether there would be a fee, but

[7] Healy claims he would not have purchased the franchise had he known of the commission split.

states that he assumed Carlson would cover ticketing costs prior to him obtaining ARC approval. Healy Dep. at 142. Taking the next leap that this omission was misleading, putting the statement in a broader context, as required by the statute, reveals that the circumstances were not such that Healy was defrauded. Though Healy does not say when Crider made this representation, he does not contest that Carlson provided him with its Getting Started Manual ("Manual"), a guide booklet for franchisees, on April 6, 1999, long before he had undertaken any significant preparations for his agency.[8] The Manual provides reference information regarding, among other things, the ARC application process, including interim ticket-writing options, and states that a fifty percent commission split is the usual fee for ticketing through another agency. Second Reilly Aff. Ex. B (Manual, Quick Reference Guide for Ticketing Through Another Office, at attach. D). Viewed in light of these circumstances, Carlson's omission would not be misleading, as the Manual provided Healy with full disclosure regarding pre-ARC approval ticketing. Healy has not raised a genuine issue of material fact to withstand summary judgment.

In sum, though Healy's pleadings manifest his discontent and regret about his experiences as a Carlson franchisee, he does not provide evidence sufficient to proceed with his fraud claim. Healy's disappointment with his managers and the failure of Red Carpet Travel are understandable, but he simply has not demonstrated that, even when viewed in the light most favorable to him, the facts establish that Carlson, who also gained nothing by Healy's failed franchise, is legally responsible for his losses. In accordance with all of the foregoing, Carlson's Motion for Summary Judgment on Count V, the IFDA fraud claim, is hereby granted.

---

[8] Healy asserts that he did not discover that he would have to share commissions until July 1999. However, even at this later date he had not yet signed his lease or hired any employees, and he had possessed the relevant information for three months.

**6. Common Law Fraud**

Carlson argues that (1) Healy has not plead his fraud claim with the particularity required by Rule 9(b) of the Federal Rules of Civil Procedure; (2) the alleged misrepresentations by Carlson are "non-actionable representations of future events;" and (3) Healy cannot establish that he reasonably relied on any of the statements he claims Carlson made to him. Def.'s Mem at 23.

Because the Court has concluded that Healy has not established a prima facie case of misrepresentation under the IFDA, it is not necessary to analyze Healy's claims under the more exacting standards of Minnesota and Illinois common law fraud. See Bixby's, 193 F. Supp. 2d at 1065 ("Common law fraud is more difficult to prove than a claim under the [IFDA] because the plaintiff must also prove actual and reasonable reliance on the representations."); Martens v. Minnesota Min. & Mfg. Co., 616 N.W.2d 732, 747 (Minn. 2000) (listing elements of fraud under Minnesota law, which are essentially identical to elements of Illinois common law fraud). Thus, summary judgment for Carlson is also granted on Healy's common law fraud claim.

**C. HEALY'S CROSS MOTION FOR PARTIAL SUMMARY JUDGMENT**

Plaintiff Healy seeks summary judgment in the form of declaratory relief on four issues, two of which have been implicitly decided by the rulings on Carlson's Summary Judgment Motion.

**1. Minnesota Franchise Act**

Healy first moves for summary judgment declaring the Minnesota Franchise Act applicable to this case. As concluded above, the MFA does not apply in this action. The Plaintiff's Motion for Summary Judgment on this point is therefore denied.

### 2. Boilerplate Language to Disavow Fraud

Healy next asks for a declaration regarding Carlson's use of boilerplate contract provisions to negate reliance. As a matter of law, Healy cannot make out a viable claim for fraud based on the evidence of record. As such, there will be no declaration that "Carlson is prohibited from using boilerplate language in the Franchise Closing Checklist to disavow its own fraud." Pls.' Mem. at 2.[9] Healy's Motion for a Declaratory Summary Judgment on this ground is denied as moot.

### 3. Collection of Lost Future Profits

Healy also moves for a declaration that Carlson may not collect future lost fees from Healy due to the closing of his agency.

A franchisor may seek damages for lost future profits for early termination of a franchise by the franchisee. See Holiday Hospitality Franchising, Inc. v. H-5 Inc., 165 F. Supp. 2d 937 (D. Minn. 1997). However, Holiday merely stated that the MFA does not prohibit recovery of lost profits, as long as the claimant can establish a founded, reasonable method for calculating such damages. Id. Illinois law is in accordance. See Midland Hotel Corp. v. Reuben H. Donnelley Corp., 515 N.E.2d 61, 66 (Ill. 1987) (affirming that "[i]t is necessary the evidence afford a reasonable basis for the computation of damages").

It is uncontested that Healy's business was a failure and Carlson has proffered no evidence of how it could reasonably establish the future profits lost by the closure of Healy's

---

[9] However, as a general matter, no defendant may escape liability for actual fraud through the use of general disclaimers. Commercial Prop. Inv., Inc. v. Quality Inns Int'l, Inc., 938 F.2d 870 (8th Cir. 1991).

unprofitable agency. Healy's Motion for Summary Judgment on this ground is granted.

**4. Collection of Attorney Fees**

The final motion for summary judgment is a declaration that Carlson is not entitled to attorneys' fees under Article 17(c) of the Agreement, which states in relevant part, "[i]f any provision of this Agreement is enforced at any time by Carlson . . . Associate is liable to Carlson for all costs and expenses of enforcement and collection, including court costs and reasonable attorneys' fees." Agreement art. 17(c). Carlson asserts by way of counterclaim that Healy breached his contractual obligations to it by failing to pay license and marketing fees, thereby giving rise to Carlson's right to collect attorneys' fees.

Minnesota and Illinois courts uphold provisions for payment of reasonable attorneys' fees. See Van Vickle v. C.W. Scheurer & Sons, Inc., 556 N.W.2d 238, 242 (Minn. Ct. App. 1996); e.g., J.B. Esker & Sons, Inc. v. Cle-Pa's P'ship, 757 N.E.2d 1271, 1279 (Ill. App. Ct. 2001). Here, however, Carlson is attempting to enforce a boilerplate provision of a contract that defines a franchise relationship that never really got off the ground. Under the circumstances such a claim is inappropriate and unfair, in light of both Carlson's superior bargaining power and its own failure to adhere strictly to the letter of the contract. Though Healy's breach of contract claim was foreclosed by his failure to prove damages, Carlson did breach its obligation to provide an opening day representative and did not provide certain promised services in a timely manner. Although not fraudulent, Carlson's conduct does not warrant an award of attorneys' fees. In consideration of the equities and the nature of the contract, Carlson will not be entitled to payment of its attorneys' fees by Healy.

## IV. CONCLUSION

Based on the foregoing, and all the files, records and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Carlson's Motion for Summary Judgment [Docket No. 13] on Count I is **DENIED**,
2. Carlson's Motion for Summary Judgment [Docket No. 13] on Counts II, III, IV, V, and VI is **GRANTED**,
3. Healy's Motion for Partial Summary Judgment [Docket No. 17] on requested Declaratory Judgments A and B is **DENIED**,
4. Healy's Motion for Partial Summary Judgment [Docket No. 17] on requested Declaratory Judgments C and D (Count I) is **GRANTED**.[10]

BY THE COURT:

ANN D. MONTGOMERY
UNITED STATES DISTRICT JUDGE

Date: October 16, 2002

[10] Only Carlson's counterclaim for past-due license and marketing fees remains. The parties shall notify the Court by October 30, 2002, as to the status of this claim, which was not the subject of a summary judgment motion.